**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NANCY KING<br><br>            Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY<br>GE PLASTICS a/k/a PLASTICS<br>TECHNOLOGIES, INC.<br>MONSANTO COMPANY<br>SOLUTIA INC.<br>PHARMACIA LLC<br>BAYER AG<br>SABIC INNOVATIVE PLASTICS US LLC<br>SABIC INNOVATIVE PLASTICS<br>TECHNOLOGIES, INC.<br>SABIC INNOVATIVE PLASTICS GLOBAL<br>TECHNOLOGIES L.P.<br>SAUDI BASIC INDUSTRIES CORP.<br>(SABIC)<br><br>            Defendants. | Case No.: |

## DEFENDANT GENERAL ELECTRIC COMPANY'S NOTICE OF REMOVAL

TO:    THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

Please take notice that, pursuant to 28 U.S.C. § 1446, Defendant General Electric Co. ("GE") removes the above-captioned action from the Superior Court of Berkshire County, Massachusetts, Cause No. 2376CV00153, to the United States District Court for the District of Massachusetts, pursuant to 28 U.S.C. § 1442(a)(l). Removal is appropriate because this action involves allegations that Plaintiff was exposed to, and suffered a personal injury from, polychlorinated biphenyls ("PCBs"), a chemical compound the federal government *required* GE to use in certain electrical products purchased by the federal government because of its fire-retardant properties. The manufacture of these electrical products required that GE dispose of

1

PCB-containing waste materials.  In the 1990s, the federal government determined that GE's Pittsfield operations had resulted in PCB contamination around Pittsfield, MA as well as on portions of the Housatonic River.  As a result, the federal government ordered and controlled GE's remediation of the Pittsfield, Massachusetts, sites, including the Allendale School and Hill 78 that Plaintiff alleges are sources of her exposure to PCBs.  In fact, the Consent Decree with the U.S. Environmental Protection Agency ("EPA") states that GE's remediation "***constitute[d] actions taken or ordered by the President***."  Ex. 1, Consent Decree, at 7 (emphasis added).

Plaintiff alleges that GE's manufacture of products containing PCBs and subsequent inadequate remediation of PCBs used in that manufacture caused injuries to her.  In contrast the EPA has concluded, and GE agrees, that GE's actions to remediate the sites at issue "are protective of human health and the environment with respect to the areas addressed" and that "no further response actions for the areas addressed . . . are necessary to protect human health and the environment."  *Id.* at 46.  Accordingly, this is a paradigmatic case for federal-officer removal because GE was "acting under" the authority of federal officers with respect to multiple aspects of the charged conduct—federal officers controlled these products from the "cradle" of manufacturing to the "grave" of remediation. In support of federal-officer removal pursuant to 28 U.S.C. § 1442(a)(l), GE states as follows:

**BACKGROUND AND FACTS**

1.      Plaintiff Nancy King filed this personal-injury action alleging that she developed a brain tumor due to her exposure to PCBs at school.  Ex. 2, Compl. ¶ 1.

2.      Plaintiff alleges that Defendant Monsanto Company ("Monsanto") was the sole manufacturer of PCBs in the United States from the 1930s through 1977, shortly after which the United States banned the domestic manufacture of PCBs.  *Id.* ¶¶ 59, 66.

3.      Plaintiff alleges that Defendant GE manufactured and serviced electrical transformers and capacitors containing PCBs at its Pittsfield, Massachusetts, plant between 1932 and 1977.  *Id.* ¶ 152.

4.      Plaintiff alleges that GE manufactured a dielectric fluid containing PCBs to insulate its manufactured electrical capacitors from overheating.  *Id.* ¶ 161.  GE trademarked this dielectric fluid as "Pyranol."  *Id.* ¶ 167.

5.      Plaintiff alleges that GE "disposed of and dumped" PCBs that were used in its manufacturing processes of Pyranol into the surrounding communities and the Housatonic River, including a disposal site near a school Plaintiff attended when she was a child.  *Id.* ¶¶ 153, 182.

6.      Plaintiff alleges that she "and many other children, have been playing next to a Superfund site drenched with PCBs."  *Id.* ¶ 184; *see also id.* ¶ 182 (alleging that "GE's hazardous waste storage facility where substantial amounts of PCBs have been discarded and dumped . . . abuts Allendale Elementary School").

7.      Plaintiff alleges that, in 2006, several doctors "urge[d] GE and EPA to consider safer alternatives than the consolidation of PCB wastes adjacent to an elementary school." *Id.* ¶ 185.  As this recognizes, GE's remediation was under the direction and control of the EPA.

8.      Plaintiff's claims are predicated on allegations regarding the manufacture, disposal, and alleged inadequate remediation of PCBs in the Pittsfield area.

9.      Plaintiff alleges that GE is strictly liable for a design defect in its manufacture of Pyranol, which consisted of 50% PCBs plus 50% trichloroethylene and traces of phenoxypropene oxides and dibenzofurans.  *Id.* ¶¶ 283-90.

10.     Plaintiff alleges that GE is liable in negligence for, among other things, using PCBs in its manufacture of Pyranol and disposing of PCBs that were used in its manufacturing process.

*Id.* ¶¶ 314-15.  Plaintiff's negligence claim also alleges that GE failed "to properly remediate PCB damage and contamination throughout Pittsfield," the "Allendale School" she attended, and "the Housatonic River."  *Id.* ¶ 314 (n), (o), (u); *see also id.* ¶ 314(t) (failing to properly construct and procure systems at PCB remediation sites); *id.* ¶ 314(v) & (w) (failing to remove all PCBs in Pittsfield and Berkshire County); *id.* ¶ 315(x) (failing to remove all PCBs from the Allendale Elementary School property).

11.     Plaintiff alleges that GE is liable for creating a private nuisance for, among other things, its storage, use, and disposal of PCBs used in the manufacturing of Pyranol, and GE's "failure to remove, failure to remediate . . . PCBs and Pyranol."  *Id.* ¶¶ 342-43.  Plaintiff alleges that this caused "a substantial and unreasonable interference with the use and enjoyment of the property of another, including the property of plaintiffs and the property of Allendale Elementary School."  *Id.* ¶ 343.

12.     Plaintiff alleges that GE is liable for creating a public nuisance for, among other things, its storage, use, and disposal of PCBs used in the manufacturing of Pyranol, and GE's "failure to remove, failure to remediate . . . PCBs and Pyranol."  *Id.* ¶¶ 354-55.  Plaintiff alleges that this caused "a substantial and unreasonable interference with the use and enjoyment of the property of another, including the property of plaintiffs and the property of Allendale Elementary School."  *Id.* ¶ 355.

13.     Plaintiff alleges that GE is liable for negligently trespassing on her land and property through the manufacturing, selling, disposing, and transporting of PCBs used in the manufacturing of Pyranol and for failing to "remove" and "remediate" PCBs.  *Id.* ¶¶ 368-72.

14.     Plaintiff alleges that GE is strictly liable by conducting an ultra-hazardous activity: storing, keeping, maintaining, using, and/or disposing of PCBs used in its manufacture of Pyranol.

*Id.* ¶¶ 374-86.

15.     Plaintiff asserts claims against GE for strict liability for design defect (Count III), negligence (Count VI), fraud (Count VII), private nuisance (Count IX), public nuisance (Count X), negligent trespass (Count XII), strict liability (ultra-hazardous activity) (Count XII [sic]), and violation of the Massachusetts Oil and Hazardous Material Release Prevention and Response Act (Count XIV).

16.     PCBs are man-made chemical fluids that the electrical industry widely used, including in transformers and capacitors, from at least the 1930s through 1979, when the federal government banned their manufacture and use.  Monsanto was the sole and exclusive manufacturer of PCBs in the United States during this time period.  Ex. 3, Memorandum from R.W. Frahm to Field Sales District Managers (Apr. 18, 1972).  PCBs were so widely used because they are "virtually free of fire and explosion hazards."  Ex. 4, Interdepartmental Task Force on PCBs, Polychlorinated Biphenyls and the Environment, at 12 (May 1972).[1]

17.     In May 1941, Monsanto wrote to the Secretary of War requesting funding for additional facilities to support a 66% increase in production of diphenyl (a core component of PCBs).  Ex. 5, Letter to U.S. Secretary of War (May 21, 1941).  Monsanto explained that its intended increase, which was about 480,000 additional pounds of diphenyl per month, was driven

---

[1] The complete Interdepartmental Task Force memorandum, including all appendices, is available at
https://nepis.epa.gov/Exe/ZyNET.exe/9101IMNO.TXT?ZyActionD=ZyDocument&Client=EPA&Index=Prior+to+1976&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C70thru75%5CTxt%5C00000022%5C9101IMNO.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

in large part by GE's need to produce massive quantities of additional Pyranol-containing transformers to fulfill the federal government's orders. *See id.* at 8 (appending a March 26, 1941, letter from GE to Monsanto urging increased production for defense-related demands). In other words, during World War II, both Monsanto and GE were required to drastically increase their production of products containing PCBs for the express purpose of filling the government's orders for the war effort.

18. From this time through the end of the domestic manufacture of PCBs in 1977, GE manufactured and sold transformers containing Pyranol (the GE proprietary dielectric insulation fluid that contained PCBs purchased from Monsanto) and Pyranol itself to the federal government for various purposes, including to meet the needs of the nation's military services. Ex. 6, 1994 U.S. Gen. Accounting Office Report (listing the number of PCB-containing transformers and other PCB-related items still in the possession of the United States Navy and Air Force nearly two decades after the end of domestic PCB production). At that time, these two branches of the United States Armed Forces had thousands of applications in continuing use that contained PCBs. *Id.* There was no data for the United States Army, which very likely also had many applications in continuing use that contained PCBs. *Id.*

19. In fact, in 1974, the United States Naval Facilities Engineering Command told GE that "[t]he Navy Department, and other agencies of the Department of Defense as well, have a substantial number of transformers and electrical devices in which the use of askarel [a generic term for a PCB-containing dielectric fluid like Pyranol] rather than ordinary transformer oil is essential. Many of these are products of the General Electric Company." Ex. 7, Navy Letter to GE, Mar. 26, 1974. The Navy further stated that "it is essential that askarel be procured for use by Government personnel in servicing these devices." *Id.*

20.    In the early 1970s, the scientific community, electric industry, and federal government began scrutinizing PCBs in response to reports of their biopersistence and potential resulting health effects. *See id.* By the early- to mid-1970s, most industrial uses of PCBs ceased. However, PCBs continued to be used, and they were even ***federally mandated***, in certain electrical applications, such as transformers and capacitors, until the EPA ultimately banned their use and manufacture in 1979. Ex. 8, General Electric Company, The Role of Polychlorinated Biphenyls in Electrical Equipment, at 6 (Dec. 16, 1971) (referring to the "various codes, standards, and regulations that now effectively require or encourage the continued use of askarel-insulated equipment in many applications"). For example, in 1972, the United States Department of Labor, Occupational Safety & Health Administration ("OSHA") adopted electrical standards necessitating the use of PCBs in a number of applications consistent with the 1971 National Electrical Code. *See* Electrical Standard, 72 Fed. Reg. 7,136 (Feb. 14, 2007) (to be codified at 29 C.F.R. pt. 1910); Application of Certain Electrical Standards, 37 Fed. Reg. 3,431 (Feb. 16, 1972) (to be codified at 29 C.F.R. pt. 1910).

21.    Monsanto ended its domestic manufacture of PCBs in 1977, and the EPA subsequently issued a final regulation banning the manufacture of PCB-containing electrical equipment (transformers and capacitors) and phasing out most PCB uses. Ex. 2, Compl. ¶¶ 59, 66; *see also* 40 C.F.R. § 761.20 (identifying permitted uses of PCBs); 40 C.F.R. § 761.30(a) ("PCBs at any concentration may be used in transformers . . . and may be used for purposes of servicing including rebuilding these transformers for the remainder of their useful lives[.]").

22.    In 2000, a District of Massachusetts federal court "entered a consent decree between GE, the United States, and the states of Massachusetts and Connecticut that launched a $300 to $700 million cleanup effort, the bulk of which [would] be paid for by General Electric."

*Church v. Gen. Elec. Co.*, 138 F. Supp. 2d 169, 173 (D. Mass. 2001). That consent decree is highly detailed and more than 400 pages long, excluding the various Statements of Work and other appendices. Ex. 1, Consent Decree.

23.  "The comprehensive remediation and restoration of the GE-Pittsfield/Housatonic River Site is being performed pursuant to [that] court-ordered Consent Decree." Ex. 9, EPA: Cleanup Agreements for the GE-Pittsfield/Housatonic River Site, *available at* https://www.epa.gov/ge-housatonic/cleanup-agreements-ge-pittsfieldhousatonic-river-site ("EPA: Cleanup Agreements"); Ex. 1, Consent Decree.

24.  The Consent Decree states that, "[s]olely for the purposes of Section 113(j) of CERCLA, the response actions selected and the Work to be performed by Settling Defendant shall constitute response actions taken or ordered by the President." Ex. 1, Consent Decree, at 7 (Background ¶ R). "Settling Defendant" is defined as "General Electric Company." *Id.* at 34.

25.  Since 2000, GE has been remediating sites in the Pittsfield area, including the Allendale School that Plaintiff attended, and the Housatonic River, under the control, guidance, and supervision of the EPA. Ex. 9, EPA: Cleanup Agreements.

26.  The Consent Decree required EPA approval for each aspect of GE's remediation that Plaintiff alleges was inadequate. Ex. 1, Consent Decree, at 44 ("Commitments by Settling Defendant").

27.  Plaintiff alleges that the Hill 78 Consolidation Area, where the Consent Decree required GE to store materials and demolition debris with PCBs of less than 50 parts per million (ppm), as measured by EPA-approved techniques, is a source of PCB contamination that injured her. Ex. 2, Compl. ¶¶ 1, 182-84, 187-92; *see also* Ex. 1, Consent Decree, at 59 (requiring use of Hill 78 for materials that have PCBs less than 50 ppm); *id*. at 121 (requiring GE to cap the Hill 78

Consolidation Area in compliance "with the specifications set forth in Attachment G to the SOW for consolidation area/landfill caps").

28. GE has not been served with process, pleadings or orders in the state court case. Pursuant to Local Rule 81.1, GE shall file with this Court certified or attested copies of all records and proceedings in the state court and a certified or attested copy of all docket entries in the state court.

## I. GE TIMELY FILED THIS NOTICE OF REMOVAL.

29. GE timely removed this action under 28 U.S.C. § 1446(b)(l), as, to GE's knowledge, Plaintiff has not yet served GE.

## II. REMOVAL IS PROPER UNDER 28 U.S.C. § 1442(A)(1).

### A. 28 U.S.C. § 1442(a)(1) Allows a Company Acting Under the Authority of a Federal Officer to Remove Actions to Federal Court.

30. Section 1442(a)(l) allows "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States" to remove a case to federal court. 28 U.S.C. § 1442(a)(l). Private entities, such as government contractors, "fall within the terms of the federal officer removal statute . . . when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153 (2007). Unlike the general removal provision, which is strictly construed in favor of remand, § 1442(a)(1) is broadly construed in favor of removal. *Id.* at 147-48; *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).

31. Under § 1442(a)(1), GE bears the burden of establishing that (1) it is "acting under" the authority of a federal officer; (2) the charged conduct was carried out "for or relating to" the asserted official authority; and (3) GE has a "colorable federal defense." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (citations omitted).

32. GE meets that burden here.

**B. Federal-Officer Removal Is Proper Based on GE's Manufacture of PCB-Containing Products Required by the Federal Government for Its Purchases.**

1. GE Was "Acting Under" the Authority of a Federal Officer.

33. In the context of § 1442(a)(1), the Supreme Court has interpreted "acting under" a federal officer to contemplate a relationship where the private party engages in an effort "to assist, or to help carry out, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 151-52. The words "acting under" are "broad" and "liberally construed." *Id.* at 147.

34. In *Watson*, the Supreme Court explained that contracting with the government to produce an item the government needs and would have to produce itself but for the contract with the private entity constitutes "acting under" for purposes of federal-officer removal:

> [T]he private contractor in such cases is helping the Government to produce an item that it needs. The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks. In the context of *Winters* [149 F.3d 387], for example, Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform.

*Id.* at 153-54.

35. In manufacturing the PCB-containing products at issue in this case, GE acted under the ongoing direction, control, and supervision of the federal government. The federal government required the use of PCBs in products that it regularly purchased from GE.

a. GE Manufactured Products with PCBs for Federal Government Purchases.

36. As a federal defense contractor, GE manufactured large quantities of PCB-containing products for purchases by numerous agencies of the federal government.

37. GE was supplying the military with capacitors containing PCBs even before the

10

United States entered World War II.  For example, in March 1940, the Chief Signal Officer of the Army Signal Corps approved the purchase of a GE Pyranol capacitor for the Army Signal Corps Laboratory.  Ex. 11, March 8, 1940 Letter with request from Major Washburn of Army Signal Corp for a capacitor with Pyranol and approval of purchase by Order of the Chief Signal Officer.

38.     During World War II, GE manufactured Pyranol-containing transformers and capacitors to fill orders from the United States military needed for the war effort.  Ex. 5, Letter to U.S. Secretary of War (May 21, 1941), at 8 (appending a March 26, 1941, letter from GE to Monsanto urging increased production for defense-related demands).

39.     As just one example, in November 1942, the Naval Bureau of Ordinance approved the purchase of three Pyranol transformers from GE by the Naval Ammunition Depot in Hawthorne, Nevada.  Ex. 12, Teletype dated Nov. 17, 1942 from the Bureau of Ordinance to NAD Hawthorne; Ex. 13, Request from Captain Byrnes, USN Bureau of Ordinance to requisition three Pyranol Transformers from General Electric; Ex. 14, Teletype dated Nov. 17, 1942 from NAD Hawthorne to USN Bureau of Ordinance confirming need for purchase of three Pyranol Transformers from General Electric.

40.     The United States War Production Board's "Authorizations of War Manufacturing Facilities Financed with Public and Private Funds through December 31, 1944" recorded that, as of May 1943, GE's Pittsfield facility was manufacturing "War Products" for the government with capacity for 2.5 million capacitors per quarter, and as of December 1944 with capacity for 18,200 modulators and transformers per quarter.  Ex. 15, Authorizations of War Manufacturing Facilities Financed with Public and Private Funds through December 31, 1944.  Plaintiff alleges that it was these very products – capacitors and transformers – that incorporated the PCBs that form the basis of her Complaint.  Ex. 2, Compl. ¶¶ 71, 75, 152, 161, 240.

41.     The United States Civilian Production Administration's List of Major War Supply Contracts, July 1940 through September 1945, shows that GE's Pittsfield facility held multiple contracts to supply transformers and capacitors to the federal government to support the war effort, including the Army Corps of Engineers, Navy Bureau of Ordnance, and the Department of the Treasury.  Ex. 16, Excerpt of United States Civilian Production Administration's List of Major War Supply Contracts, July 1940 through September 1945.

42.     The key role of GE's Pittsfield facility in manufacturing electrical products with PCBs for the United States military's war effort can also be seen in two applications for Certificates of Necessity during WWII.  In 1942, GE applied to the War Department for a Certificate of Necessity for, among other locations, its Pittsfield facility for manufacturing capacitors, stating that GE's Pittsfield facility had converted 100% of its output to support the war effort.  Ex. 17, September 1, 1942 Application for Certificate of Necessity.  In 1943, GE applied to the War Department for another Certificate of Necessity for, among other locations, its Pittsfield facility that manufactured "G.E. dielectric material No. 2681-2682 and promika capacitors." Ex. 18, July 9, 1943 Application for Certificate of Necessity.

43.     GE's sales of PCB-containing products to the Department of Defense was so widespread that it has even been recognized in case law.  As the Ninth Circuit noted in a case related to a ruptured electrical transformer, "GE purchased PCBs from Monsanto in order to produce Pyranol, a fire-resistant dielectric fluid, which GE then used as insulation in electrical transformers and other devices.  In 1949, GE sold one of its transformers to the Navy and delivered it to Guam." *Abuan v. Gen. Elec. Co.*, 3 F.3d 329, 331 (9th Cir. 1993).

44.     GE's manufacture of Pyranol-containing transformers and Pyranol for the United States Department of Defense continued into the 1970s.  Ex. 19, United States Army, PCB TMDL

Action Plan at 23-27 (listing numerous GE transformers as currently in use at the Fort Myer & Henderson Hall installations); Ex. 20, Memorandum from Henry Vaness Dobson, Jr., to Judge Advocate General (June 26, 1987) (referring to a General Electric PCB transformer at the Navy's Piti Power Plant). Indeed, United States military installations included "thousands of electrical transformers and other electric equipment that either contain or are suspected to contain PCBs," many of which GE manufactured. Ex. 6, 1994 U.S. Gen. Accounting Office Report, at 2 ("The military services have significant quantities of PCBs in equipment such as electrical transformers and capacitors on their installations.").

45. GE's transformers included a PCB-containing dielectric insulation fluid called Pyranol. Ex. 21, Mem. Regarding Polychlorinated Biphenyls, General Electric Company, at 1 (Aug. 26, 1976) ("General Electric's askarels are called Pyranol."); Ex. 22, Sales Information Bulletin (Sept. 10, 1973) (referring to Pyranol as a GE product); Ex. 8, General Electric Company, The Role of Polychlorinated Biphenyls in Electrical Equipment, at 8 (Dec. 16, 1971) (stating that GE exclusively used Pyranol); Ex. 23, Pyranol, General Electric ("Pyranol is the trade-mark of the General Electric Company for cooling and insulating materials which generically are known as askarels"-i.e., PCBs.).

46. In 1970 alone, the General Services Administration, Department of the Interior, United States Army, United States Navy, and other branches of the federal government purchased at least 6,750 pounds of Pyranol, meaning that each of these federal agencies had previously purchased numerous GE PCB-containing transformers that required replacement Pyranol. Ex. 24, Monsanto Report of Pyranol Sales (Dec. 1971). In 1971, the federal government again purchased more than 6,000 pounds of Pyranol. *Id.*

47. In a single shipment in December 1971, the United States Navy purchased more

than 2,000 pounds of Pyranol.  Ex. 25, United States Navy Invoice (Dec. 17, 1971).  In February 1972, the Naval Supply Center in Oakland, California, again purchased over 2,000 pounds of "Pyranol . . . [manufactured] by General Electric Co."  Ex. 26, Naval Supply Center Invoice (Feb. 7, 1972).

48.    By no later than February 1972, Monsanto discontinued all direct sales of Pyranol to end users.  Ex. 27, Letter from T.L. Gossage to A.E. Peltosalo (Feb. 8, 1972).  Accordingly, after February 1972, the federal government purchased its Pyranol for GE transformers directly from GE.  *See generally id.*

49.    The many GE sales to the United States military are reflected in the fact that more than 15 years after domestic manufacturing ceased, the military had thousands of transformers with PCBs and other PCB-related items in continuing use.  *See* Ex. 6, 1994 U.S. Gen. Accounting Office Report (listing the number of PCB-containing transformers and other PCB-related items still in the possession of the United States Navy and Air Force).  At that time, the Navy still had 4,600 PCB-containing transformers and 1,861 other PCB-related items.  *Id.* at 8.  The Air Force still had 4,904 PCB-containing transformers and 2,599 other PCB-related items in 1990.  *Id.*  And that says nothing of the Army, which purchased similar equipment from GE, but never made a comparable inventory.  *See id.*

50.    The New Jersey Army National Guard, which is federally funded and operated under federal control in certain circumstances, also purchased GE transformers.  Ex. 28, Final Summary Report: Suspected PCB Containing Electrical Equipment Inventory, at 19, 23, 27, 38-40, 42-45, 49-52 (Feb. 2017) (stating that GE PCB-containing transformers exist at various Army National Guard installations in New Jersey).

51.    GE also sold PCB-containing transformers and capacitors to Amtrak—a federally

14

owned and controlled corporation. Ex. 29, U.S. Dep't of Transp., Polychlorinated Biphenyls (PCBs) in Transit System Electrical Equipment, at 4-2 (May 1984) (stating that Amtrak has 75 self-propelled cars and 26 locomotives with PCB-containing transformers); *id.* at 4-6 (stating that GE estimates "twenty small [PCB-containing] capacitors and three large [PCB-containing] capacitors are used per rail car"); *id.* at D-2 (referring to GE as a producer of PCB-containing transformers).

52.    The above list is not intended to be an exhaustive list of all the times GE sold products containing PCBs to the federal government but, rather, an illustrative list of the close relationship GE and various federal government agencies had over this important chemical compound.

2.    The Federal Government Supervised, Controlled, and Required GE's Production of PCB-Containing Products Until It Banned PCBs in 1979.

53.    The federal government was not a passive purchaser of PCBs. During the time period relevant to this case, the federal government worked hand-in-hand with GE by supervising and controlling GE's production of PCB-containing products—and, for a period of time, required that manufacturers like GE continue to use PCBs in certain applications.

54.    In May 1972, multiple federal agencies, including the Department of Commerce and the EPA, issued an interdepartmental task force report on PCBs. That report concluded that the continued use of PCBs in the products GE manufactured was "***necessary*** because of the significantly increased risk of fire and explosion and the disruption of electrical service which would result from a ban on PCB use." Ex. 4, Interdepartmental Task Force on PCBs, Polychlorinated Biphenyls and the Environment, at 4 (May 1972) (emphasis added). That is, no safer alternative material could sufficiently guard against fire hazards in certain products. *Id.* at 4, 12.

55.     In light of the necessity of PCBs, the federal government ***mandated*** that GE use PCBs in the products GE manufactured and the federal government purchased.  Ex. 8, General Electric Company, The Role of Polychlorinated Biphenyls in Electrical Equipment, at 6 (Dec. 16, 1971) (referring to the "various codes, standards, and regulations that now effectively require or encourage the continued use of askarel-insulated equipment in many applications.").

56.     As the EPA stated, "[v]arious Federal, state, and local conditions require[d] use of askarel [a generic term for PCB-containing fluids] in transformers" such as the ones manufactured by GE.  Ex. 30, Environmental Protection Agency, Industry Views on the Use of Polychlorinated Biphenyls in Transformers and Capacitors, at 17 (June 1976).

57.     As one example, in February 1972, OSHA adopted portions of the National Electrical Code that required GE to use PCBs in a number of applications.  *See* 37 Fed. Reg. 3,431 (Feb. 16, 1972) (to be codified at 29 C.F.R. pt. 1910) ("Every new electrical installation and all new utilization equipment installed after March 15, 1972, and every replacement, modification, or repair or rehabilitation, after March 15, 1972, of any part of any electrical installation or utilization equipment installed before March 15, 1972, shall be installed or made, and maintained, in accordance with the provisions of the 1971 National Electrical Code."); Ex. 31, Excerpts of National Electrical Code § 410-82 (1971) ("Transformers of other than the askarel-insulated or dry-type shall not be used.").

58.     The federal government also set procurement specifications for the PCB-containing products GE made and sold to the federal government.  Ex. 32, Hearing on Toxic Substances Control Act, at 80 (Oct. 24, 1976) (stating that the "Department of Defense, the General Services Administration, and other agencies" had "procurement specifications . . . concerning the purchase of PCBs and materials containing PCBs").

59.     In 1974, the United States Navy said that a continued supply of Pyranol from GE for use as a dielectric insulating fluid was "essential."  Ex. 7, Navy Letter to GE, Mar. 26, 1974. The Naval Facilities Engineering Command told GE that "[t]he Navy Department, and other agencies of the Department of Defense as well, have a substantial number of transformers and electrical devices in which the use of askarel rather than ordinary transformer oil is *essential*. Many of these are products of the General Electric Company."  *Id.* (emphasis added).  The Navy further stated that "it is *essential* that askarel be procured for use by Government personnel in servicing these devices."  *Id.* (emphasis added).

60.     In April 1979, the EPA issued final regulations banning the manufacture of PCBs and phasing out most PCB use.  Press Release, EPA, EPA Bans PCB Manufacture; Phases Out Uses (Apr. 19, 1979), *available at* https://www.epa.gov/archive/epa/aboutepa/epa-bans-pcb-manufacture-phases-out-uses.html.  The EPA also issued final regulations governing PCB disposal.  *See* 40 C.F.R. § 761.60.  Accordingly, after April 1979, the federal government exercised control and direction over the disposal of PCBs as well.

61.     GE has demonstrated that it was "acting under" government authority by manufacturing and selling to the federal government products (transformers and capacitors containing Pyranol (PCBs) and Pyranol itself to maintain such transformers) that the federal government considered "essential," and for which the government also set procurement specifications *requiring* GE to use PCBs in the products, which the government would have had to produce itself but for the contracts with GE.  *See Watson*, 551 U.S. at 153-54.

### 3.     Plaintiff's Allegations Relate to GE's Manufacture of PCBs Per Federal Government Specifications to Supply the Federal Government.

62.     GE must demonstrate that "the charged conduct was carried out 'for or relating to' the asserted official authority."  *Moore*, 25 F.4th at 34 (quoting 28 U.S.C. § 1442(a)(1)).

63.     The requirement that a claim be "for" or "relate to" the alleged federal authority is not a causal requirement and is not to be understood as anything more than a "related to" nexus. *Id.* at 35.  Only a "nexus" between the claims and the alleged official authority need exist; it is sufficient that at least one of the plaintiff's claims is "connected" or "associated" with the defendant's acts under color of federal office.  *Id.* at 35 & n.4.

64.     "Any single claim is independently sufficient to satisfy the 'for or relating to' requirement under § 1442(a)(1)."  *Id.* at 35.  At least one of Plaintiff's claims is "connected" or "associated" with GE's manufacture of products with PCBs for sales to the federal government, which is the "charged conduct" GE took under the authority of the federal government:

a.      In Count III, Plaintiff alleges that GE is strictly liable for a design defect in its manufacture of Pyranol, of which 50% is PCBs.  Ex. 2, Compl. ¶¶ 283-90.

b.      In Count VI, Plaintiff alleges that GE is liable in negligence for, among other things, using PCB in its manufacture of Pyranol and disposing of PCBs that were used in its manufacturing process.  *Id.* ¶¶ 314-15.

c.      In Count IX, Plaintiff alleges that GE is liable for creating a private nuisance for, among other things, its storage, use, and disposal of PCBs used in the manufacturing of Pyranol.  *Id.* ¶¶ 342-52.

d.      In Count X, Plaintiff alleges that GE is liable for creating a public nuisance for, among other things, its storage, use, and disposal of PCBs used in the manufacturing of Pyranol.  *Id.* ¶¶ 354-66.

e.      In Count XII, Plaintiff alleges that GE is liable for negligently trespassing on her land by manufacturing, selling, disposing, and

18

transporting PCBs used in the manufacturing of Pyranol. *Id.* ¶¶ 368-72.

f.       In Count XII [sic], Plaintiff alleges that GE is liable in strict liability by conducting an ultra-hazardous activity: storing, keeping, maintaining, using, and/or disposing of PCBs used in its manufacture of Pyranol. *Id.* ¶¶ 374-86.

65.     The alleged conduct therefore "was carried out 'for or relating to' the asserted official authority." *Moore*, 25 F.4th at 34 (quoting 28 U.S.C. § 1442(a)(1)). Accordingly, GE's sale of transformers and capacitors with PCBs was conducted under the color of federal office because the U.S. government, through sales contracts and regulations, compelled continued manufacture of these PCB-containing products to advance what it deemed necessary governmental and public interests.

### 4.       GE Has Colorable Federal Defenses.

66.      Under § 1442(a)(1), a "colorable [federal] defense" need not be "clearly sustainable." *Willingham*, 395 U.S. at 407. The Supreme Court has rejected a "narrow, grudging interpretation" of the requirement. *Id.*

67.     "[A] federal defense is colorable unless it is immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous." *Moore*, 25 F.4th at 37 (citations omitted).

68.     GE has two colorable federal defenses within the meaning of the federal officer removal statute—the government-contractor defense and federal preemption.

### a.       GE Has a Government-Contractor Defense.

69.     First, GE has a government-contractor defense to Plaintiff's negligence, design defect, public nuisance, private nuisance, negligent trespass, and strict liability (by conducting an

ultra-hazardous activity) claims. GE was acting as a government contractor when it engaged in the actions complained of in this case. Indeed, the federal government purchased many of the products manufactured with PCBs at issue.

70. The government-contractor defense applies when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512 (1988).

71. As explained above, (i) the federal government required the use of PCBs in GE's products and set procurement specifications for those products, (ii) GE's products conformed to the federal government's requirements and specifications, and (iii) GE informed the federal government of any hazards inherent in the use of PCBs that GE was aware of but the federal government was not. Indeed, the federal government knew as much, if not more, than GE about this issue. *See, e.g.*, Ex. 4, Interdepartmental Task Force on PCBs, Polychlorinated Biphenyls and the Environment, at 2 (May 1972) (stating that the government task force completed "a six month review of the chemicals known as PCBs"); Ex. 33, Letter from Gerald Barney to Charles Sommer (Jan. 17, 1972) (stating the Navy's belief that "one of the most serious threats to the marine environment is the class of chemicals known as polychlorinated biphenyls").

72. In fact, the federal government, including the military, specifically directed GE to sell products containing PCBs for governmental and military uses.

73. For example, during World War II, GE was manufacturing Pyranol-containing transformers and capacitors to fill orders from the United States military needed for the war effort. Ex. 5, Letter to U.S. Secretary of War (May 21, 1941), at 8 (appending a March 26, 1941, letter

20

from GE to Monsanto urging increased production for defense-related demands).

74. These sales to the military continued for decades.  In 1974, the United States Naval Facilities Engineering Command told GE that it was "essential" that it be able to obtain Pyranol from GE to service the many transformers and electrical devices it had purchased from GE.  Ex. 7, Navy Letter to GE, Mar. 26, 1974.

75. Accordingly, the government-contractor defense is colorable.  *See Moore*, 25 F.4th at 37 (government-contractor defense can constitute a "colorable" federal defense for federal-officer removal).

b. GE Has Federal Preemption Defenses.

76. GE also has a colorable defense of federal preemption of the claims.

77. "[U]nder the Supremacy Clause, from which [the] pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (citations omitted).

78. The Toxic Substances Control Act ("TSCA") includes an express preemption clause.  *See* 15 U.S.C. § 2617.  TSCA expressly states that where the EPA issues rules applicable to PCBs that are intended to protect against a health or environmental risk associated with PCBs, then no state may impose any non-identical requirement "applicable" to PCBs.  *Id.* § 2617(a)(2)(b).

79. Pursuant to TSCA's delegation of rulemaking authority under 15 U.S.C. § 2605, the EPA has promulgated a comprehensive set of rules regulating the manufacture, distribution, and use of PCBs.  Those rules are codified at 40 C.F.R. § 761.20 *et seq.*  Among the EPA's promulgated rules are rules governing the manufacture, distribution, and use of PCBs.  *See* 40 C.F.R. §§ 761.20 (regulating use, manufacture, processing and distribution of PCBs), 761.30

21

(authorizing certain "non-totally enclosed PCB activities"), 761.35 (governing storage of PCBs for reuse), and 761.40 (marking requirements).

80. The EPA's rules also are intended to protect against health and environmental risks associated with PCBs. *See, e.g.*, 40 C.F.R. § 761.20 ("the Administrator hereby finds . . . that the manufacture, processing, and distribution in commerce of PCBs at concentrations of 50 ppm or greater . . . present an unreasonable risk of injury to health within the United States"); 43 Fed. Reg. 7150 ("The intent of these regulations [40 CFR Part 761] is to protect the environment from further contamination by PCB's resulting from improper handling and disposal of PCBs.").

81. Because the EPA promulgated rules regulating the manufacture, distribution, and use of PCBs to protect against certain health risks associated with PCBs, TSCA expressly preempts any state-law requirements that are "applicable" to PCBs, intended to protect against a health risk, and not identical with the EPA's rules.

82. Here, Plaintiff's common-law tort claims constitute state-law "requirements" for preemption purposes. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008) ("Congress is entitled to know what meaning this Court will assign to terms regularly used in its enactments. Absent other indication, reference to a State's 'requirements' includes its common-law duties."). The tort claims are also "applicable" to health risks associated with PCBs. And, finally, because GE complied with the EPA's rules concerning the distribution and sale of products with PCBs, Plaintiff is seeking to impose state-law requirements that are not identical to the EPA's rules promulgated under TSCA.

83. Plaintiff's claims are also impliedly preempted. The EPA's comprehensive regulation of the manufacture, sale, and use of PCBs constitutes field preemption. Moreover, Plaintiff's allegations that PCBs in products were unreasonably dangerous and should not have

22

been manufactured conflicts with OSHA regulations requiring their manufacture and continued use. *See* Electrical Standard, 72 Fed. Reg. 7,136 (Feb. 14, 2007) (to be codified at 29 C.F.R. pt. 1910); Application of Certain Electrical Standards, 37 Fed. Reg. 3,431 (Feb. 16, 1972) (to be codified at 29 C.F.R. pt. 1910).

84.     For these reasons, GE has a colorable federal-preemption defense under the federal-officer removal statute. *See, e.g.*, *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 192 (5th Cir. 2019) ("As they have a ***colorable*** federal preemption defense, the cooperatives were entitled to remove under 28 U.S.C. § 1442's provision for federal officer removal."); *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1146 (11th Cir. 2017).

85.     Having met the requisite elements, GE asserts that federal-officer removal is proper based on Plaintiff's claims predicated on GE's manufacture and sale of PCB-containing products.

**C.      Federal-Officer Removal Is Proper Based on GE's Alleged Inadequate Remediation of PCB Sites Pursuant to the EPA's Control and Direction.**

1.      GE Was "Acting Under" the Authority of a Federal Officer.

86.     In 2000, a Massachusetts federal court entered a consent decree between GE, the EPA, and the states of Massachusetts and Connecticut to remediate sites in the Pittsfield area and Housatonic River. *Church*, 138 F. Supp. 2d at 173; *see also* Ex. 1, Consent Decree.

87.     "The Consent Decree was a product of a complaint filed by the United States on behalf of the EPA, the Department of the Interior, and the National Oceanic and Atmospheric Administration pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607, Sections 3008 and 7003 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6928 and 6973, and other statutes." *United States v. Gen. Elec. Co.*, 986 F. Supp. 2d 79, 81-82 (D. Mass. 2013);

*see also* Ex. 1, Consent Decree, at 1 (Background ¶ A).

88.     The Consent Decree "was intended 'to resolve the [parties'] claims for response actions, response costs and natural resource damages in connection with' the PCB contamination from GE's manufacturing facility." *Housatonic River Initiative v. U.S. Env't Prot. Agency, New England Region*, 75 F.4th 248, 257 (1st Cir. 2023) (quoting Consent Decree).

89.     The "GE-Pittsfield/Housatonic River Site" to which the Consent Decree applies includes "the GE Plant Area, the Former Oxbow Areas, *the Allendale School Property*, the Housatonic River Floodplain - Current Residential Properties, the Housatonic River Floodplain - Non-Residential Properties, the Silver Lake Area, the Upper 1/2 Mile Reach, the 1 1/2 Mile Reach, the Rest of the River, and other properties or areas to the extent that they are areas to which Waste Materials that originated at the GE Plant Area have migrated and which are being investigated or remediated pursuant to this Consent Decree." Ex. 1, Consent Decree, at 35 (emphasis added).

90.     The Consent Decree states that "the response actions selected and the Work to be performed by Settling Defendant *shall constitute response actions taken or ordered by the President*." *Id.* at 7 (Background ¶ R) (emphasis added). GE's site remediation, including at the Allendale School and the Hill 78 Consolidation Area, "constitute[d] actions taken or ordered by the President." *Id*. Accordingly, GE has conducted a responsible and comprehensive remediation with respect to PCBs used at its Pittsfield facility, and has done so while acting under the authority of a federal officer when it acted on behalf of, or was ordered by, the President of the United States.

91.     The Consent Decree requires GE to "finance and perform the Work in accordance with this Consent Decree, the SOW, the Rest of the River SOW, and Work Plans attached to this Consent Decree, and all work plans and other plans, standards, specifications, and schedules set forth herein or developed by Settling Defendant *and approved by EPA* pursuant to this Consent

24

Decree." *Id.* at 44 ("Commitments by Settling Defendant") (emphasis added). EPA approval was required for each aspect of GE's remediation that Plaintiff alleges was inadequate. *Id.* GE was acting under the authority of a federal officer in performing the challenged remediation because it was accomplished in close collaboration with, and under the close supervision of the EPA.

92. The EPA determined that, "[e]xcept as expressly provided in this Consent Decree, no further response actions for the areas addressed by such Removal Actions are necessary to protect human health and the environment." *Id.* at 46.

93. The Consent Decree with the EPA required GE to store materials and demolition debris with PCBs of less than 50 parts per million (ppm), as measured by EPA-approved techniques, at the Hill 78 Consolidation Area. *Id.* at 59. The Consent Decree further required GE to cap the Hill 78 Consolidation Area in compliance "with the specifications set forth in Attachment G to the SOW for consolidation area/landfill caps." *Id.* at 121.

94. On July 12, 1999, the EPA issued an Action Memorandum for the Allendale School Removal Action in which the "EPA selected a removal action for the Allendale School." *Id.* at 7. The Consent Decree with the EPA required GE to perform the Allendale School Removal Action as described in the Statement of Work ("SOW") and the EPA's July 12, 1999, Action Memorandum. *Id.* at 45, 62.

95. The Consent Decree with the EPA states that GE's remediation performance, including "all design and implementation of the Allendale School Removal Action" and "the design, implementation, and operation of the Hill 78" Consolidation Area, was a GE "contractual obligation" with the United States. *Id.* at 61-62.

96. Not only was GE required to perform the remediation under the guidance and control of the EPA as a contractual matter, but because the Consent Decree is "a judicial act,"

25

failing to follow the EPA's direction and control could subject GE to "the powers by which a court protects its judgments, including, most notably, the power of contempt." *Del. Valley Citizens' Council for Clean Air v. Commonwealth of Pa.*, 533 F. Supp. 869, 880 (E.D. Pa. 1982), *aff'd,* 678 F.2d 470 (3d Cir. 1982); *Cmty. Ass'n for the Restoration of the Env't v. Nelson Faria Dairy, Inc.*, No. CV-04-3060-LRS, 2011 WL 6934707, at \*2 (E.D. Wash. Dec. 30, 2011) ("Defendant is in contempt with regard to those eight violations of the Consent Decree."). The federal government's control over GE's remediation performance was both contractual and through threat of a contempt finding.

97.    "In the event EPA determine[d] that [GE] has ceased implementation of the Allendale School Removal Action (and associated on-plant consolidation activities) . . . as required by Paragraph 16 a, is seriously or repeatedly deficient or late in its performance of such response actions under Paragraph 16 a, or is implementing such response actions under Paragraph 16 a in a manner which may cause an endangerment to human health or the environment, EPA may assume the performance of the Removal Action in question (including associated on-plant consolidation activities)." Ex. 1, Consent Decree, at 73. That is, if GE did not perform the remediation as required in the Consent Decree, the EPA would have had to perform the remediation itself.

98.    GE performed an appropriate and comprehensive remediation, including the design and implementation of the Allendale School Removal Action and the design, implementation, and operation of the Hill 78 Consolidation Area, pursuant to the EPA's specific control, guidance, and specifications.

99.    GE therefore was "acting under" a federal officer in performing the remediation. *City of St. Louis v. Velsicol Chem. Corp.*, 708 F. Supp. 2d 632, 661-62 (E.D. Mich. 2010) (holding that where the EPA exercised "direct and detailed" control over defendants'

CERCLA cleanup pursuant to settlement agreement, defendants were "properly characterized as assisting the EPA to perform a task that the government would otherwise be obligated to perform absent the agreement" such that the acting under element of federal-officer removal was met); *accord Abbo-Bradley v. City of Niagara Falls*, 73 F.4th 143, 152 (2d Cir. 2023) (Sullivan, J., concurring) (finding that defendant would have demonstrated that it was "acting under" a federal officer because its CERCLA remediation work was performed "under" specific instructions from officers of the EPA, Department of Justice, and/or Department of the Interior, and "under" ongoing supervision by additional EPA officers, but that the removal was untimely); *Greene v. Citigroup, Inc.*, No. 99-1030,  2000 WL 647190, at *2 (10th Cir. May 19, 2000) (finding the "acting under" element of federal officer removal met where "Shattuck implemented a remedy selected by the EPA, a federal agency, pursuant to CERCLA, and it was subject to civil penalties for failure to comply with that directive"); *People of State of Cal. v. H & H Ship Serv. Co.*, No. 94-10182,  1995 WL 619293, at *2 (9th Cir. Oct. 17, 1995) (holding that a corporation was "acting under" federal officer when performing tasks "taken during the course of a removal action that was under the direction and control of the Coast Guard").

        2.      Plaintiff's Claims and Allegations Relate to GE's Remediation Performed Under the EPA's Control and Guidance.

100.    GE must demonstrate that "the charged conduct was carried out 'for or relating to' the asserted official authority." *Moore*, 25 F.4th at 34 (quoting 28 U.S.C. § 1442(a)(1)).  Only a "nexus" between the claims and the alleged official authority need exist; it is sufficient that at least one of the plaintiff's claims is "connected" or "associated" with the defendant's acts under color of federal office. *Id.* at 35 & n.4.

101.    "Any single claim is independently sufficient to satisfy the 'for or relating to' requirement under § 1442(a)(1)." *Id.* at 35.  At least one of Plaintiff's claims is "connected" to or

"associated" with GE's remediation under color of federal office of the areas alleged to be a source of PCBs that purportedly harmed Plaintiff:

a.   In Count VI, Plaintiff alleges that GE is liable in negligence for, among other things:

   i.   "Failing to properly remediate PCB damage and contamination throughout Pittsfield." Ex. 2, Compl. ¶ 314(n).

   ii.   "Failure to properly remediate PCB damage and contamination in the Housatonic River." *Id.* ¶ 314(o).

   iii.   "Failure to properly construct and procure adequate devices, controls, grading, gradient, capping, equipment, and systems at PCB remediation sites and dumping sites throughout Pittsfield so as to prevent the further transmission of PCBs throughout the air, water, and environment." *Id.* ¶ 314(t).

   iv.   "Failure to timely, adequately, and properly remediate, clean up, or attempt to remediate and clean up its PCB contamination throughout the City of Pittsfield, Berkshire County, Housatonic River, and Allendale School." *Id.* ¶ 314(u).

   v.   "Failure to remove or eliminate all PCBs from Pittsfield." *Id.* ¶ 314(v).

   vi.   "Failure to remove or eliminate all PCBs from Berkshire County." *Id.* ¶ 314(w).

   vii.   "Failure to remove or eliminate all PCBs from the Allendale Elementary School property." *Id.* ¶ 314(x).

28

b.   In Count IX, Plaintiff alleges that GE is liable for creating a private nuisance for, among other things, GE's "failure to remove, failure to remediate . . . PCBs and Pyranol, as outlined throughout the entirety of this complaint." *Id.* ¶ 343.  GE allegedly caused "a substantial and unreasonable interference with the use and enjoyment of the property of another, including the property of plaintiffs and the property of Allendale Elementary School." *Id.*

c.   In Count X, Plaintiff alleges that GE is liable for creating a public nuisance for, among other things, GE's "failure to remove, failure to remediate . . . PCBs and Pyranol, as outlined throughout the entirety of this complaint." *Id.* ¶ 355.  GE allegedly caused "a substantial and unreasonable interference with the use and enjoyment of the property of another, including the property of plaintiffs and the property of Allendale Elementary School." *Id.*

d.   In Count XII, Plaintiff alleges that GE is liable for negligently trespassing on her land by, among other things, its "failure to remove [and] failure to remediate" PCBs.  *Id.* ¶ 369.

102.   Plaintiff alleges that the remediated Allendale School and the Hill 78 Consolidation Area, capped according to the EPA's control and specifications, are sources of PCB contamination that purportedly harmed her.  Some examples are:

a.   Plaintiff alleges that she "and many other children, have been playing next to a Superfund site drenched with PCBs." *Id.* ¶ 184; *see also id.* ¶ 182 (alleging that "GE's hazardous waste storage facility where

29

substantial amounts of PCBs . . . abuts Allendale Elementary School").

b.    Plaintiff alleges that in 2006, several doctors "urge[d] GE and EPA to consider safer alternatives than the consolidation of PCB wastes adjacent to an elementary school." *Id.* ¶ 185.

c.    Plaintiff alleges that "GE previously designated its 'Hill 78' as GE's hazardous waste storage facility where substantial amounts of PCBs have been discarded and dumped.   Shockingly, Hill 78 abuts Allendale Elementary School and, quite literally, flows downhill into the elementary school property." *Id.* ¶ 182.

d.    Plaintiff alleges that "Hill 78, GE's aforementioned toxic PCB dump, sits just forty (40) feet from the elementary school plaintiff attended." *Id.* ¶ 187.

e.    Plaintiff alleges that, "[i]nexcusably, GE and SABIC chose to not install a bottom liner beneath Hill 78.  This means that when there is a lot of rain-which there frequently is in Berkshire County-more PCBs and chemicals leach out of the bottom of Hill 78 and into surrounding areas, including Allendale Elementary School." *Id.* ¶ 190.

f.    Plaintiff alleges that in addition to attending school at Allendale Elementary School, she "spent many hours, over multiple years, playing in the contaminated playground and fields at Allendale Elementary School." *Id.* ¶ 1.

103.    GE's alleged inadequate remediation thus "was carried out 'for or relating to' the asserted official authority" of the EPA.  *Moore*, 25 F.4th at 34.

30

3. GE Has a Colorable Federal Defense Regarding Plaintiff's Claims <u>Predicated on an Inadequate Remediation.</u>

104. "[A] federal defense is colorable unless it is immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous." *Id.* at 37 (citations omitted).

105. GE has a colorable defense of federal preemption. CERCLA preempts Plaintiff's state-law tort claims predicated on allegations that GE failed to adequately remediate sites by ***not*** departing from the terms of the CERCLA Consent Decree and/or by inadequately performing those terms. *See, e.g.*, *Bartlett v. Honeywell Int'l Inc.*, 737 F. App'x 543, 549 (2d Cir. 2018) (holding that state-law tort claims were preempted by CERCLA because "at bottom the residents were impermissibly arguing, on a state tort law theory, that Honeywell should have departed from the consent decree's terms by conducting additional or different remedial action than that mandated by CERCLA and the consent decree"); *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1249-50 (10th Cir. 2006) (plaintiffs' state-law claims were preempted where they were premised upon the inadequacy of defendants' implementation of a CERCLA-based remedy); *see also Abbo-Bradley*, 73 F.4th at 152 (Sullivan, J., concurring) ("When we recently considered a functionally identical [CERCLA preemption] defense in 2018, we ruled that it was meritorious. Needless to say, a meritorious federal defense is, a fortiori, a 'colorable' one.").

106. Because GE has met the requisite elements, federal-officer removal also is proper based on Plaintiff's claims of GE's alleged inadequate remediation of PCB sites.

107. Although only one claim and one basis for federal officer is necessary to establish federal jurisdiction, each of GE's bases does so independently.

**D. GE Is a "Person" Under § 1442(a)(1).**

108. GE is a "person" within the meaning of 28 U.S.C. § 1442(a)(1). *Moore*, 25 F.4th

31

at 32 ("hold[ing] that Electric Boat has established the statutory requirements for removal");

*Camacho v. Autoridadde de Telefonos de Puerto Rico*, 868 F.2d 482, 484-86 (1st Cir. 1989).

> **E.      GE Can Remove This Entire Action Without the Consent of Its Co-Defendants.**

109.    "Federal officer removal constitutes an exception to the general rule that removals must be unanimously agreed to by the defendants."  *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 195 (D. Mass. 2008) (citing *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998)); *accord, e.g.*, *Iowa Pub. Serv. Co. v. Iowa State Com. Comm'n*, 407 F.2d 916, 918 n.3 (8th Cir. 1969) ("[T]he federal officer alone can remove without other defendants joining in the petition, and the entire case is removed to the federal court.").

## III.    VENUE

110.    Venue is proper in the District of Massachusetts because this is the district "within which such action is pending."  28 U.S.C. § 1446(a).

## IV.    NOTICE OF REMOVAL AND JURY DEMAND

111.    Pursuant to 28 U.S.C. § 1446, filing a copy of this Notice with the Clerk of the State Court effects the removal of the state-court action.  A copy of the Notice to Adverse Party and State Court of Removal of Action to Federal Court to be filed contemporaneously in the state court is attached as Exhibit 10.

112.    No waiver and no admission of fact, law, or liability, including (without limitation) the amount of damages, if any, is intended by this Notice of Removal, and all defenses, affirmative defenses, and rights are hereby reserved.

113.    Pursuant to Fed. R. Civ. P. 81(c), GE will file its answer or present its other defenses or objections available under the Federal Rules within seven days after the filing of this Notice of Removal or it will obtain an extension of time to file such pleadings.

114.    GE demands a trial by jury on all claims so triable.

## CONCLUSION

For the reasons set forth above, GE removes this action to the United States District Court

for the District of Massachusetts.

Dated: October 6, 2023.                              DEFENDANT GENERAL ELECTRIC
                                                     COMPANY,

                                                     By its Attorneys,

                                                     */s/ James M. Campbell*
                                                     James M. Campbell (BBO #541882)
                                                     Christopher B. Parkerson (BBO #662952)
                                                     Michelle M. Byers (BBO #684836)
                                                     CAMPBELL, CONROY & O'NEIL, P.C.
                                                     20 City Square, Suite 300
                                                     Boston, MA 02129
                                                     Ph. (617) 241-3000
                                                     jmcampbell@campbell-trial-lawyers.com
                                                     cparkerson@campbell-trial-lawyers.com
                                                     mbyers@campbell-trial-lawyers.com

## CERTIFICATE OF SERVICE

I, James M. Campbell, hereby certify that on this 6th day of October, 2023, I electronically filed the foregoing with the Clerk of the Court using the Court's electronic filing system (ECF). The foregoing document is also available for viewing and/or downloading from ECF.  Said document was also sent via Electronic Mail to the following counsel of record:

John B. Stewart
JOHN B. STEWART, P.C.
73 Chestnut Street, Suite 310A
Springfield, MA 01103
TheTrialer@aim.com
*Counsel for Plaintiff*

                                                     */s/ James M. Campbell*
                                                     James M. Campbell

33